Joe L. CALDWELL; M. Douglas Berry,
Trustee of the Estate of Joe L.
Caldwell, Bankrupt,

v.

Tedd MUNCHAK

v.

The MUNCHAK CORPORATION (of
Georgia); Pak Fabrics, Inc.

Civ. A. No. C75-236.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 26, 1982.

Jeffrey M. Smith, Richard L. Shackelford, Trotter, Bondurant, Miller & Hishon, Atlanta, Ga., Edward M. Glennon, Linquest & Vennum, Minneapolis, Minn., for plaintiff.

C.B. Rogers, Joseph C. Miller, James W. Beverage, Rogers & Hardin, Atlanta, Ga., for Tedd Munchak.

Edgar H. Sims, Jr., Kutak Rock & Huie, Atlanta, Ga., for third-party defendants.

## ORDER

ORINDA D. EVANS, District Judge.

Plaintiff Caldwell is a former professional basketball player. Plaintiff Berry is his trustee in bankruptcy, added as a party at trial. During the 1974–75 season, Caldwell was suspended by the Spirits of St. Louis, and was never paid his salary for that season. He therefore brought this diversity action against Defendant Munchak on a guarantee that Munchak had executed when Caldwell signed his playing contract with a predecessor team to the Spirits. Munchak then filed a third-party complaint against Third-Party Defendants Pak Fabrics, Inc. and Munchak Corporation (of Georgia), the primary obligors on Caldwell's playing contract, on an indemnity theory. The case has been tried to the Court without a jury, and this Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

From 1964 to 1970, Joe Caldwell played basketball in the National Basketball Association ("NBA"). He was selected for the NBA All-Star team during his last three years in the NBA, and by 1970 he was

generally regarded as one of the best players in the league.

During the late 1960's, a rival league was formed to challenge the dominance of the NBA. This league, the American Basketball Association ("ABA"), attempted to obtain the services of established NBA players as well as those of players leaving the college ranks. Caldwell, whose final contract with the NBA's Atlanta Hawks had expired at the end of the 1969–70 season, signed a five-year contract with Southern Sports Corporation, the owner of the Carolina Cougars of the ABA, on October 30, 1970. *See* Ex. P–1. The contract provided for an annual salary of $220,000. Caldwell was to be paid $150,000 on January 15 of each season (except the first, which is not relevant here), and $70,000 five years after January 15 of each season. At the time Caldwell signed this contract, Munchak was one of the owners of Southern Sports Corporation. To induce Caldwell to sign with the Cougars, and on the same day, Munchak executed an irrevocable guarantee. In this document, Munchak guaranteed prompt payment of Caldwell's playing salary up to one million dollars. *See* Ex. P–2. The guarantee provided that the law of North Carolina would apply to its interpretation and enforcement. *Id.* at 3.

During the next four years, Caldwell performed ably for the Carolina Cougars; he was selected for the ABA All-Star team during two of those years. He was also elected Vice-President and later President of the ABA Players Association, the players' union. In addition, by 1974 he had been selected as the player representative

of the Cougars' players, and as their captain as well. A player representative is an official comparable to a union shop steward.

After Caldwell's fourth season with the Cougars, Munchak decided to get out of the basketball business, and sold the team to a group of investors headed by Ozzie and Daniel Silna.[1] The new owners moved the Cougars to St. Louis, and rechristened them "The Spirits of St. Louis." They then began to court Marvin Barnes, one of the best college basketball players of the previous four years. The Spirits outbid an NBA team for Barnes' services, and signed him to a seven-year contract for a total compensation of approximately two million dollars. The Spirits, and indeed the entire ABA, pinned high hopes upon Barnes; they expected him to draw fans and to give the team and league added stature in their battle for survival against the dominant NBA. However, the Spirits had reason to suspect that Barnes might cause them some problems; while in college, he had pleaded guilty to the assault of one of his teammates, and the Spirits had played some role in obtaining counsel for him on that occasion.

As the 1974–75 season began, Barnes began to establish himself as a star player. Barnes had trouble living within his means, however. He apparently began to consider the possibility of renegotiating his contract, either to provide for more compensation or to provide for the payment of his compensation in larger chunks over a shorter period. Barnes turned to Caldwell, the Spirits' captain, player representative, and elder statesman, for advice. Caldwell looked over

---

1. Munchak had acquired sole control of the Cougars by later 1973 through the Munchak Corporation, a Delaware corporation which had acquired 100% of the assets of the Cougars from Southern Sports Corporation. Rather than purchasing the assets of the Cougars from the Munchak Corporation, the Silna brothers requested that the transaction be structured as a sale of stock. Munchak therefore created the Munchak Corporation (of Georgia), and caused the Munchak Corporation to transfer its basketball assets to this entity in return for a note for $1,500,000. These assets included Caldwell's playing contract. Pak Fabrics, Inc., a corporation controlled by the Sil-

nas, then purchased all the stock of the Munchak Corporation (of Georgia) for $1,000 and assumed the $1,500,000 note to the Munchak Corporation. Pak Fabrics then apparently set up a limited partnership called "The Spirits of St. Louis," with itself as the general partner and major investor, to own and manage the basketball team. Among the limited partners were Harry Weltman, the Spirits' general manager, and Donald Schupak, the team's legal counsel. The limited partnership later agreed to indemnify Munchak against any liability to Caldwell on the guarantee at issue here, by agreement dated July 29, 1976. *See* Ex. P–10.

Barnes' contract, and concluded it was deficient in certain respect. He so informed Barnes.[2]

According to the testimony of general manager Weltman, Barnes began to approach management on a regular basis to request that his contract be renegotiated. Although Barnes' contract had been negotiated for him by Bob Woolf, a respected agent, Barnes asked Caldwell for the names of other agents. Caldwell furnished Barnes with three names, including that of Marshall Boyar, his own agent. Barnes contacted Boyar.

The foregoing facts are essentially[3] undisputed. It is also undisputed that Barnes, with the assistance and advice of his new agent Marshall Boyar, eventually left the Spirits and refused to play in several games, as a tactic to force the Spirits to renegotiate his contract. Barnes' subsequent playing career was marked by disputes with the managements of several teams; in fact, he employed the one-man wildcat strike on at least one other occasion in his career.

The disputed facts in this case concern Caldwell's involvement in Barnes' decision to adopt this particular negotiating ploy for the first time. The Spirits suspended Caldwell for allegedly persuading Barnes to breach his contract by leaving the team. This suspension eventually resulted in the case now before the Court.

On November 20, 1974, the Spirits were scheduled to play the New York Nets at the Nassau Coliseum on suburban Long Island. It was to be the Spirits first appearance in New York during the 1974–5 season, and therefore Barnes' first appearance in New York as a professional basketball player. The Silna brothers, who were residents of the New York area, invited 500 friends, associates, and potential investors in the ABA to attend the game, and scheduled a post-game party for their guests and for the team. The game was also important because the ABA was seeking a national television contract, using Barnes as one of its selling points; New York, of course, is the home of the network officials whom the ABA wanted to impress.

Several hours before the game, Barnes, Caldwell, and Boyar and his wife took a limousine from the team's hotel to La Guardia airport. Barnes and the Boyars left the limousine at La Guardia, and boarded a plane for Dayton, Ohio; Caldwell rode back to the hotel. Barnes and Caldwell testified regarding their conversation in the limousine. The Boyars were not called as witnesses by either side. Barnes testified that Boyar and Caldwell had previously persuaded him to leave the team, against his better judgment, and that during the ride to the airport, they did little more than laugh about the expected reaction of the Spirits' management. Caldwell testified that he did not propose or agree with Barnes' course of action. Indeed, he testified that he attempted to persuade Barnes and Boyar not to take the drastic action they were contemplating. The Court concludes that Caldwell's version is much closer to the truth.

Caldwell had put Barnes in touch with Boyar, but it was Boyar and not Caldwell who proposed to Barnes the idea of leaving the team. Barnes needed little persuasion, and Boyar selected the New York game as likely to have the greatest impact. Boyar then flew from his home in Los Angeles to New York to spirit Barnes away. Caldwell was invited along for the ride to the airport, and, perhaps swept up in the excitement, accepted the invitation. He did not agree with Boyar's proposal, and so stated to Barnes and Boyar. He was in no position to stop them, however, and knew it.

The Court has three reasons for rejecting the testimony of Barnes and accepting that

---

**2.** Unlike Caldwell's, for example, Barnes' contract did not provide that he would be paid if injured. It provided for deferred payments from an unstable team in an unstable league over a span of 15 years, and it was not backed by a personal guarantee. See Ex. D–1.

**3.** Caldwell's testimony that he gave three agents' names to Barnes was disputed by Barnes. This difference is resolved in Caldwell's favor.

of Caldwell. The first concerns the demeanor of Caldwell and Barnes, as observed when they testified, plus the nature of Caldwell's relationship with Boyar. Caldwell appears to be a serious-minded, somewhat idealistic man of average intelligence. He is easygoing and not particularly aggressive. His relationship to Boyar dated back to Caldwell's teenage years, when his older sister had worked in Boyar's home as a domestic employee. Boyar had helped Caldwell to use his basketball talents to get a college education, and became Caldwell's agent during his career in professional basketball. At the time of the events at issue, Caldwell still admired, trusted and looked up to Boyar. The third character in this drama is Marvin Barnes; the Court is of the opinion that he is a shrewd, manipulative, aggressive and impulsive individual. On the basis of these personalities and relationships, the Court considers it unlikely that Caldwell dreamed up the idea of Barnes' dramatic departure. Caldwell is far more likely to have been a passive participant, unwilling to break openly with a trusted adviser or to betray a teammate who had sought his assistance in his capacity as player representative.

Secondly, Caldwell was the more credible witness. Caldwell was open and forthright on both direct and cross examination. Barnes was evasive; as he himself testified, he is a courtroom veteran, and it was obvious that he has learned the art of answering questions without providing much information. On the basis of credibility alone, the Court would have chosen to credit the testimony of Caldwell.

Finally, Barnes' version of the material events has varied from time to time. His testimony here, that Caldwell and Boyar persuaded him to leave the team, is similar to the story he apparently told to the Spirits' management upon his return to the fold in November 1974. Subsequently, however, he related a completely different version of these events to Joseph Wershba, a producer with the CBS news program "60 Minutes." In essence, Barnes told Wershba in a series of telephone conversations that Caldwell had nothing to do with his decision to leave the team, and that the Spirits were using the events of November 1974 as an excuse to avoid paying Caldwell his 1974–75 salary. Wershba taped these phone conversations without Barnes' knowledge, and the Court admitted the tape recording into evidence for the sole purpose of impeachment. *See* Ex. P–13. This prior inconsistent statement is one more independent basis for the Court's decision that Caldwell's testimony is more credible than that of Barnes.[4]

Caldwell showed up for the game and, of course, Barnes did not. As game time approached, Spirits' coach Jack MacKinnon asked several players, including Caldwell, if they knew where Barnes was. Caldwell replied that he did not know where Barnes was. In fact, Caldwell did not know where Barnes and Boyar were bound; under the circumstances, however, his response to MacKinnon's question was less than forthright. The Spirits played without Barnes, and lost.

Barnes and Boyar achieved the result they desired; the scene at the Nassau Coliseum after the game was described by general manager Weltman as "chaos." The 500 invited guests were unhappy, as were the rest of the fans. The press was besieging the Spirits' management with questions about Barnes' whereabouts; various Spirits' officials were asking each other the same questions. In the midst of this brouhaha, Donald Schupak, the Spirits' legal counsel and a member of the management team, again asked Caldwell if he knew where Barnes was. Caldwell once against stated that he had no idea.

The press tracked Barnes and Boyar to Dayton in short order. Negotiations ensued between the Spirits and their falling star. The Spirits refused to renegotiate Barnes' contract, and he eventually left Boyar for his home in Providence. Barnes returned

---

4. The credibility choice between Caldwell and Barnes is not a close one. Even if it were, however, the Court notes that Defendant bears the burden of proof on the question of the propriety of Caldwell's termination. *See* discussion below.

to the team in late November, 1974, after missing several games.

The Spirits' management was understandably curious about the circumstances of Barnes' disappearance. Upon his reappearance, in an interview with Weltman, Barnes blamed the episode on Boyar and Caldwell. Weltman passed this information on to Schupak. Schupak instructed Weltman to get a sworn statement from Barnes. Barnes then appeared before a court reporter, took an oath, and repeated his story that Caldwell had convinced him to leave the team.

On that same day, December 3, 1974, the Spirits' management suspended Caldwell indefinitely. This action was taken after discussion between Schupak, Weltman and the Silnas.

Caldwell was in North Carolina on that day, with the Spirits' permission. The Spirits therefore sent a telegram to Caldwell at the address of his lawyer in Greensboro, announcing his indefinite suspension as "a result of your failure to conduct yourself in a manner consistent with your contractual obligations to the club and for activities detrimental to the best interest of the club, the American Basketball Association, and professional sports." See Ex. P–3. On the same day, the Spirits also sent a letter of suspension to Caldwell, at Boyar's address in California. See Ex. P–4. The letter stated that he was suspended without pay, for an as-yet-undetermined period. The letter stated that the suspension resulted from his violation of section 11(b) of his contract and his tortious conduct against the club in participating in a conspiracy to disturb the Spirits' relationship with Barnes. The letter indicated that Caldwell was free to contact the Spirits or the ABA Commissioner to discuss the matter further. The ABA Commissioner at this time, however, was Munchak, who of course no longer owned any part of the Spirits though he was still liable on the guarantee to Caldwell.

Upon receiving the suspension telegram in Greensboro, Caldwell immediately flew to St. Louis to discuss the matter with Weltman. Weltman suggested that they arrange a conference call with Schupak and Munchak, but Munchak could not be reached. Schupak, Weltman and Caldwell did discuss Barnes' charges, and Caldwell denied them.

After this conversation, Schupak, Weltman and the Silnas discussed the situation more thoroughly. They consulted with Munchak in his capacity as Commissioner, and with Michael Goldberg, the ABA's legal counsel. Munchak told the Spirits management that an indefinite suspension would not be permitted. At some point in the next several days, the Spirits decided to terminate Caldwell's services altogether. They never specifically notified him of this decision, however, despite the existence of a clause in his contract that permitted the Spirits to terminate him "upon written notice." Ex. P–1 at ¶ 11(1).[5]

After his December 3 conversation with Weltman and Schupak, Caldwell turned to his attorney and those of the ABA Players Association. The ABA bylaws grant the Commissioner the power to "hear and formally decide any dispute to which a player, official or coach is a party," Ex. P–6 at ¶ 5.4, and Players Association general counsel Prentiss Yancey urged this course of action on Caldwell. On December 6, in fact, Yancey wrote to Commissioner Munchak "on behalf of the Players Association" to demand a hearing. Ex. D–2. Yancey testified he intended this letter to be on behalf of Caldwell as well. Four days later, ABA general counsel Goldberg responded that further information was "necessary in order to determine the proper framework for any hearing." Ex. D–2A. Munchak realized that he had a conflict of interest because of his liability on the guarantee, and made it clear that he would step aside

---

**5.** There was some limited proof on the issue of whether the Spirits put Caldwell "on waivers" under the bylaws of the ABA. The evidence regarding this issue was not well developed, and there was no showing that the "waiver" of Caldwell would be of any legal significance in this action; the Court therefore makes no finding of fact regarding this issue.

at any hearing in favor of a neutral arbitrator.

After consultation with his own lawyers, however, Caldwell decided not to pursue arbitration. Therefore his attorney J. Le-Vonne Chambers wrote to the Spirits on December 26, demanding Caldwell's immediate reinstatement with back pay. *See* Ex. P–5. The Spirits refused to reinstate Caldwell.

Under the terms of Caldwell's contract, the non-deferred portion of his playing salary for the 1974–75 season was to be paid on January 15, 1975. On that date, the Spirits refused to make this payment, despite the fact that Caldwell had played in 23 games, or a little more than 25% of the ABA's season, before his suspension. In early February, 1975, Caldwell brought this action on the guarantee against Munchak. A few weeks later, he filed a lawsuit against the Spirits and several other defendants in the Southern District of New York, charging the Spirits with breach of his playing contract and all the defendants with violations of the antitrust laws. The New York action is presently pending.

Caldwell told Yancey in mid-December that he did not intend to pursue arbitration by the Commissioner or his delegate. Yancey believed that the issues arising from Caldwell's suspension were important to the Players Association, however, and so he decided to pursue them on behalf of the Association. He therefore continued to press for a hearing, making it clear to the Commissioner's Office that he was doing so only on behalf of the Players Association and not Caldwell. *See* Ex. D–2B. The Commissioner's Office scheduled a hearing. Caldwell told the parties that he would not participate, whereupon the Spirits objected to the hearing. No hearing was ever held.

Caldwell's contract required a $70,000 payment of deferred compensation on January 15 of each year between 1976 and 1980. The 1976–78 payments were made by the Munchak Corporation, which by then had changed its name to Atlanta Northwest, Inc. The 1979 payment was made by Munchak personally. Caldwell did not re-ceive the 1980 payment of $70,000, which was his deferred compensation from the memorable 1974–75 season. Therefore he is still owed his entire salary of $220,000 for the 1974–75 season, and it is for that amount that he brings this action on Munchak's guarantee.

Munchak Corporation (of Georgia) and Pak Fabrics, Inc., the Third-Party Defendants, did not defend this action at trial. At the commencement of the trial, their counsel informed the Court that his clients had instructed him not to participate in the trial of this action. He then left the courtroom, and the trial proceeded in the absence of the Third-Party Defendants.

## CONCLUSIONS OF LAW

The legal issue in this case is simple and straightforward. Munchak executed an irrevocable guarantee of certain salary payments to be made to Caldwell by Southern Sports Corporation and its successors. He did so to induce Caldwell to sign a playing contract. Caldwell has never been paid $220,000 on the underlying contract. Munchak does not contend that the guarantee is invalid. Therefore, Caldwell is entitled to judgment against Munchak unless the Spirits, as successors in interest to Southern Sports Corporation, are excused from the obligation to pay the $220,000 by virtue of a prior breach of contract on Caldwell's part. Thus, the issue of the propriety of Caldwell's suspension is dispositive of this case.

Munchak has raised a preliminary issue concerning the standard the Court must apply in deciding whether Caldwell's termination was justified. Munchak contends that the ABA bylaws required Caldwell to pursue arbitration by the Commissioner's Office, and because he failed to do so the Court can find his termination wrongful only if it is arbitrary and capricious.

■ There are at least two flaws in this argument. First, the only cases cited by Munchak apply the arbitrary and capricious standard to decisions made by league commissioners. *See Charles O. Finley & Co. v. Kuhn,* 569 F.2d 527 (7th Cir.), *cert. denied,*

439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *Atlanta National League Baseball Club, Inc. v. Kuhn,* 432 F.Supp. 1213 (N.D. Ga.1977). In this case, Munchak asks the Court to extend this reasoning to a decision made by a team, and not reviewed by a league commissioner. This would be a quantum leap; many of the policies justifying judicial deference to a decision by a presumably unbiased league commissioner do not apply to decisions by a team.

The fatal flaw in Munchak's argument, however, is that it is based on an inaccurate premise. Caldwell's playing contract specifically incorporated certain paragraphs of the ABA Uniform Player Contract ("UPC"). *See* Ex. P–1 at ¶ 11. It did not incorporate paragraph 13 of the UPC, which provides for binding arbitration by the Commissioner of all disputes between a player and his club. There was testimony that while journeymen players generally signed the UPC, players of Caldwell's stature had enough bargaining power to negotiate modifications of the UPC. Such modifications were expressly permitted by the ABA bylaws, subject to the approval of the Commissioner. *See* Ex. P–6 at § 15.2. The Court finds that Caldwell bargained for the omission of several UPC clauses when he joined the Cougars in 1970, including the mandatory arbitration clause. Furthermore, the Court also finds that the Commissioner did not disapprove Caldwell's contract with Southern Sports Corporation at the time it was signed, and thus it was "considered as approved" by the league. *Id.* § 15.3.

Munchak contends that Caldwell was bound to arbitrate his dispute, however, even though UPC ¶ 13 was not a part of his contract. According to Munchak, the ABA bylaws require such arbitration, and Caldwell was bound by those bylaws; to the extent that his contract was inconsistent with the bylaws, it was void. This argument ignores the fact that the ABA league office did not disapprove of the contract. Furthermore, even assuming that a league bylaw could void an inconsistent contract provision, this particular law of athletes' contracts does not help Munchak. The

ABA bylaws simply do not require the submission of all disputes to the Commissioner. The provision on which Munchak relies, section 5.4, states that "the Commissioner shall hear and finally decide any dispute to which a player, official or coach is a party." See Ex. *id.* at § 5.4. This section is part of Article V, which consists of a listing of the Commissioner's powers. It does not say, and in its context cannot be read to imply, that all disputes *must* be submitted to the Commissioner. It merely gives the Commissioner the power to resolve all disputes that are submitted to him, presumably including those between players and their clubs submitted pursuant to ¶ 13 of the UPC.

Finally, Munchak's argument ignores the language of the guarantee itself. It provided that Munchak waived the right to require Caldwell to pursue any other remedies against any other parties before enforcing the guarantee. *See* Ex. P–2 at 2–3. For all of these reasons, the Court concludes that Caldwell was under no duty to submit to arbitration by the Commissioner's Office and need not establish that his suspension was arbitrary and capricious to prevail.

■ In fact, to prevail on this action on the guarantee, Caldwell need only establish that he was willing and able to perform his duties and that the Spirits nonetheless refused to make the payments required by the underlying contract. He has done so. As Munchak concedes, this shifts the burden of proof to him to establish his affirmative defense that Caldwell's suspension was justified because Caldwell himself breached the contract.

According to Munchak, Caldwell performed two separate acts that justified his termination. He convinced Barnes to leave the Spirits, and he lied to MacKinnon and Schupak about his knowledge of Barnes' whereabouts on November 20, 1974.

With regard to the first contention, the Court has found that any persuasion that Barnes required came from Boyar, not Caldwell. Munchak contends that Caldwell is liable nonetheless, because Barnes' depar-

ture was the foreseeable result of Caldwell's introduction of Barnes and Boyar. If this is so, it must be for reasons Munchak failed to establish in the record. There was vague evidence that Boyar had been involved with a player named Jim McDaniel who once left a team for some reason. However, there was more than ample specific evidence that Caldwell had never missed a game, or even a practice, without permission during the eleven seasons in which Boyar represented him. Furthermore, Munchak's argument overstates Caldwell's involvement in Barnes' decision to employ and listen to Boyar; Caldwell merely gave Barnes the names of three agents, including that of Boyar.

The Court finds, however, that Caldwell was less than forthright with MacKinnon and Schupak on the night Barnes left the team. The Court must decide whether this justified the Spirits' decision to suspend him.

Caldwell was suspended for violating paragraph 11(b) of his contract, and for "tortious conduct" against the Spirits. Ex. P–4. The tort apparently was his alleged interference with the contract relations between the Spirits and Barnes. *See id.; see, e.g., Childress v. Abeles,* 240 N.C. 667, 84 S.E.2d 176, 181 (1954); *Bryant v. Barber,* 237 N.C. 480, 75 S.E.2d 410, 412 (1953). The Court has concluded that Caldwell had little to do with Barnes' decision to leave the Spirits. Munchak has not suggested that Caldwell's misstatements to MacKinnon and Schupak constituted any other tort. Thus Caldwell was not guilty of the "tortious conduct" with which he was charged. The Court therefore turns to paragraph 11(b) of his contract.

Paragraph 11(b) incorporates paragraphs 3a(1), (2), (4), and (5) of the UPC into the agreement between Caldwell and Southern Sports Corporation. UPC ¶¶ 3a(1) and (2), which require Caldwell to maintain himself in good physical condition and report to work at times set by the team, are irrelevant. UPC ¶ 3a(4) requires Caldwell "always to conduct himself on and off the

court according to the highest standards of honesty, morality, fair play and sportsmanship." UPC ¶ 3a(5) requires Caldwell "not to do anything which is detrimental to the best interests of the CLUB or of the American Basketball Association or of professional sports."

The two key phrases, "detrimental to the best interests of the CLUB" and "the highest standards of honesty, morality, fair play and sportsmanship," do not set a clear, specific standard of acceptable behavior. They are not self-defining, and are not further defined in Caldwell's playing contract. Caldwell does not contend, however, that these clauses are so vague as to be unenforceable. The question, then, is how to interpret them.

However the phrase "detrimental to the best interests of the Club" is interpreted, Caldwell did not violate UPC ¶ 3a(4). His misstatements to Schupak and MacKinnon had no effect on the Club's "interests," one way or the other. Had he been forthright, Caldwell could have told his employers that Barnes had been at La Guardia several hours before with Boyar. From this they could surmise that Barnes and Boyar had flown somewhere, but no more. The information would not have aided the Spirits in locating Barnes, and therefore was not "detrimental to the best interests" of the Spirits, the ABA or professional sports.

UPC ¶ 3a(5) poses a different problem. The "highest standards of honesty, morality, fair play and sportsmanship" arguably might proscribe any half-truths of any kind. However, the Court must apply common sense to the interpretation of the contract. It is obvious that the parties did not intend to make insubstantial matters good cause for termination of the contract. Such an amorphous clause necessarily contains an implied requirement that a departure from the highest standards of honesty be material before it could constitute cause for termination. Regardless of the degree of materiality that should be read into UPC ¶ 3a(5), the standard was not met in this case.[6]

**6.** Furthermore, Barnes' contract contained language nearly identical to that of Caldwell's.

Thus Munchak is liable on the guarantee. The only remaining question involves the extent of Munchak's liability.

The guarantee renders Munchak liable for "prompt payment of all indebtedness or liabilities under Paragraphs 1 and 2 of said contract between SOUTHERN SPORTS CORPORATION and CALDWELL, but in no event to exceed the sum of One Million Dollars." Ex. P–2 at 1. Paragraph 1 of Caldwell's playing contract sets forth the payment schedule for his salary of $220,000 per year for four years; paragraph 2 is irrelevant. Munchak contends that his obligation under the guarantee would be extinguished when Caldwell received one million dollars from Southern Sports Corporation and its successors. Because it is undisputed that Caldwell has received a total of $880,-000, or his playing salary for four years under paragraph 1 of the underlying contract, under Munchak's interpretation of the guarantee his maximum remaining liability is $120,000. Caldwell, of course, takes the position that the guarantee applies to all payments specified in paragraph 1 of the underlying contract, and the cap of one million dollars applies to Munchak's maximum liability for any such payments he is forced to make.

Had the parties intended to adopt Munchak's present interpretation of the guarantee, they could easily and clearly have done so by stating that the guarantee applied to "the first one million dollars of indebtedness or liabilities under Paragraphs 1 and 2." They did not do so; in fact, they specifically stated that Munchak was guaranteeing "*all* indebtedness or liabilities" (emphasis added). The Court concludes that Caldwell's interpretation is the more reasonable. Furthermore, to the extent that the guarantee is ambiguous, the Court must construe it against Munchak, at whose direction it was drafted. *Yates v. Brown,* 275 N.C. 634, 170 S.E.2d 477, 482 (1969); *Windfield Corp. v. McCallum Inspection Co.,* 18 N.C.App. 168, 196 S.E.2d 607, 611 (N.C.App. 1973).

Munchak's liability in this action, then, is not limited to $120,000. It is limited to something less than one million dollars because he is entitled to credit for the $70,000 payment he made to Caldwell on or about January 15, 1979. He may also be entitled to credit for the $70,000 payments made by his company to Caldwell in January of 1976, 1977 and 1978, but the Court need not decide this issue; even if he is entitled to such credit, his remaining potential liability here far exceeds the amount awarded to Caldwell in this Order.

Because there is no $120,000 limitation on Munchak's liability, he is liable for Caldwell's entire unpaid 1974–75 salary of $220,-000. Caldwell is also entitled to interest, of course. Furthermore, the guarantee provides that Caldwell is entitled to the reasonable attorney's fees and costs and expenses he incurs in collecting on the guarantee. Ex. P–2 at 3.

The statutory interest rate under North Carolina law at the time that Caldwell's salary payments fell due was six percent. N.C.Gen.Stat. § 24–1 (amended 1981). Effective July 1, 1981, this rate was raised to eight percent. N.C.Gen.Stat § 24–1. Caldwell is therefore entitled to interest on $150,000 from January 15, 1975 to July 1,

See Ex. D–1 at ¶ 3(d) (requiring Barnes to "conduct himself in accordance with the highest standards of morality, honesty, fair play and sportsmanship and [not to] do anything which shall be detrimental or prejudicial to the CLUB, the ASSOCIATION or of professional sports"). When Barnes abandoned the Spirits as a negotiating ploy, the club made no attempt to enforce this clause against him. Therefore, the Spirits must have believed that Barnes had not violated his contractual duties to maintain "the highest standards of morality, honesty, fair play and sportsmanship" and not to do anything "detrimental" to the Spirits. "The best evidence of the intentions of the parties to a contract," the North Carolina Supreme Court has stated, "is the practical interpretation given to their contracts by the parties while engaged in their performance." *Peaseley v. Virginia Iron, Coal & Coke Co.,* 282 N.C. 585, 194 S.E.2d 133, 144, (1973), citing *Cole v. Fibre Co.,* 200 N.C. 484, 157 S.E.2d 857 (1931). This contemporaneous indication of the Spirits' interpretation of these contract terms reinforces the Court's conclusion that the parties did not intend paragraph 11(b) of Caldwell's contract to proscribe relatively minor transgressions.

1981 at six percent, and thereafter until the date of judgment in this action at eight percent. He is entitled to interest on $70,000 from January 15, 1980 until July 1, 1981 at six percent, and thereafter until the date of judgment in this action at eight percent.

The guarantee also entitles Caldwell to reasonable attorney's fees. The Court has asked the parties to brief the issue of the applicability of N.C.Gen.Stat. § 6–21.2 to this contract. The Court DEFERS consideration of the amount of attorney's fees to be awarded, if any, until it has the benefit of the views of the parties.

The guarantee also entitles Caldwell to recover "all other costs and expenses" he incurred in enforcing the guarantee. Ex. P–2 at 3. Such costs and expenses, according to the affidavit of one of his attorneys, totalled $9,343.24. Supplemental Affidavit of Letitia J. Grishaw dated July 8, 1982 at ¶ 4. Caldwell is entitled to an award of this amount.

Finally, there remains Munchak's third-party action against the Munchak Corporation (of Georgia) and Pak Fabrics, Inc. The assets of Southern Sports Corporation, the entity that signed the playing contract with Caldwell, had been purchased by the Munchak Corporation by 1973. In 1974, the Munchak Corporation transferred its basketball assets and liabilities, specifically including the Munchak Corporation's obligations on its player contracts commencing with the 1974–75 season, to the Munchak Corporation (of Georgia). *See* Bill of Sale and Assignment Agreement, document no. 2 in Ex. D–1C. Pak Fabrics then purchased the stock of the Munchak Corporation (of Georgia) from the Munchak Corporation, specifically agreeing in the process to assume the obligation to pay Caldwell's 1974–75 salary pursuant to his playing contract. *See* Addendum to Purchase Agreement, document no. 1 in Ex. D–1C, at ¶ 1. Consequently, the Munchak Corporation (of Georgia) and its parent, Pak Fabrics, are the primary obligors for the payment of Caldwell's playing salary for the 1974–75 season. Munchak, as a guarantor of this primary obligation, is entitled to indemnification from those parties in the amount of Caldwell's recovery in this action.

## CONCLUSION

The Court finds for Caldwell and against Munchak in the principal amount of $220,000, plus interest, costs and expenses of $9,343.24. Caldwell may also be entitled to attorney's fees in an amount yet to be determined.

The parties are DIRECTED to confer and to compute the amount of interest, calculated as described above, and to inform the Court of the amount within ten (10) days of date of entry of this Order. The parties are DIRECTED to file their briefs on the attorney's fees issue within the same period.

The Court finds for Munchak and against Third-Party Defendants Munchak Corporation (of Georgia) and Pak Fabrics, Inc. in the amount of the judgment in the primary action.

SO ORDERED, this 26 day of July, 1982.