Joseph L. **CALDWELL**, Plaintiff,

v.

The **AMERICAN BASKETBALL ASSOCIATION, INC.**, The Spirits of St. Louis Basketball Club, a limited partnership, Ozzie Silna, Daniel Silna, Harry Weltman, Donald Schupak and Tedd Munchak, Respondents.

No. 75 Civ. 1235 (LBS).

United States District Court,
S.D. New York.

June 14, 1993.

As Amended June 22, 1993.

Brandes, Lane & Joffe, P.C. (Richard Brandes, of counsel), Phoenix, AZ, Miller, Singer, Raives & Brandes, P.C. (Lawrence I. Brandes, Robert M. Raives, James J. Calder, Adrian H. Von Hassell, of counsel), New York City, for plaintiff.

Siller, Wilk & Mencher (Jack David, Steven Finell, Peter T. Shapiro, David C. Berg, of counsel), New York City, for The Spirits of St. Louis Basketball Club, Donald Schupak and Daniel Silna.

Teitelbaum, Hiller, Rodman, Paden & Hibsher, P.C. (Herbert Teitelbaum, of counsel), New York City, for Tedd Munchak.

## OPINION

SAND, District Judge.

This case requires the Court to revisit questions relating to the application of the antitrust laws to professional basketball. *Cf. United States Football League v. National Football League,* 842 F.2d 1335 (2d Cir.1988); *North American Soccer League v. National Football League,* 670 F.2d 1249 (2d Cir.1982), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). Plaintiff Joe L. Caldwell, a former professional basketball player, was suspended on December 3, 1974 by The Spirits of St. Louis Basketball Club (the "Spirits"), a member team of the now defunct American Basketball Association ("ABA"). In his complaint, Caldwell alleges that the circumstances surrounding his suspension constitute a "concerted refusal to deal" or a "group boycott" on the part of all named defendants, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. Plaintiff also asserts a pendant claim for either intentional tort or *prima facie* tort under New York law against the Spirits, Donald Schupak, and Daniel Silna (collectively the "Spirits Defendants").

The Spirits Defendants have moved for summary judgment. Defendant Tedd Munchak has also moved for summary judgment. The other defendants—the American Basketball Association, Inc., Ozzie Silna, and Harry Weltman—have not moved for summary judgment and, according to Caldwell, are in default. Pl.'s Mem. at 1 n. 1. The Spirits Defendants have also moved to strike, pursu-

ant to Fed.R.Civ.P. 56(e), portions of the plaintiff's papers in opposition to the defendants' motions for summary judgment.

For the reasons that follow, the defendants' motions for summary judgment are granted in their entirety, and the complaint is dismissed as against the moving defendants. The Spirits Defendants' motion to strike is granted to the extent set forth herein.

## BACKGROUND

When considering a motion for summary judgment, all justifiable inferences are to be drawn in the non-movant's favor. *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Accordingly, the Court will resolve any factual disputes in favor of the plaintiff.

In 1964 plaintiff Joe L. Caldwell, who had been an all-American basketball player at Arizona State University, was drafted to play professional basketball for the Detroit Pistons, a member team of the National Basketball Association ("NBA"). Caldwell was subsequently traded to the St. Louis Hawks, also a member team of the NBA. The Hawks later moved to Atlanta and became known as the Atlanta Hawks.

When Caldwell's contract with the Hawks expired in 1970, both the Hawks and the Carolina Cougars, an ABA team, offered Caldwell lucrative contracts. On October 30, 1970, Caldwell signed a five year contract with Southern Sports Corporation ("Southern Sports"), the corporate owner of the Cougars. The contract provided for annual compensation of $220,000, a pension of $600 per month for each of Caldwell's years of service as a professional basketball player, and life insurance equal to 100 times the cash value of the pension. Defendant Tedd Munchak, one of the owners of Southern Sports, personally guaranteed the contract. The contract expired by its own terms on October 29, 1975. *See* Caldwell Employment Agreement ("Caldwell Agreement") ¶ 2, attached

as Ex. A to the Affidavit of Jack David ("David Aff.").

Because Caldwell was a nationally recognized player—known by his fans as "Jumping Joe Caldwell"—he had the bargaining power to negotiate a contract which incorporated by reference only certain provisions of the ABA Uniform Player's Contract ("ABAUPC"). *See* Caldwell Agreement ¶ 11(b). Among those provisions of ABAUPC that were incorporated by reference was Article 3(b) which provided, in pertinent part:

> Compliance with CLUB Rules. The CLUB may from time to time ... establish reasonable rules for the government of its players.... The CLUB may also suspend the player for violation of any rules so established, and during such suspension, the player shall not be entitled to any compensation under this contract. All of the foregoing shall be in addition to any other rights and remedies the CLUB may have at law, equity or otherwise. When the player is fined or suspended, he shall be given notice in writing, stating the amount of the fine or the duration of the suspension and the reasons therefore.

ABAUPC ¶ 3(b). The Caldwell Agreement also incorporated by reference ABAUPC ¶ 12(c)(3), which gave the Cougars the power to terminate the contract in the event of a breach by Caldwell. The Caldwell Agreement did *not* incorporate ¶ 14 of ABAUPC pursuant to which the player agreed to be bound by the ABA's Constitution and by-laws. *See* Caldwell Aff. ¶ 13; *Caldwell v.*

*American Basketball Ass'n,* 75 Civ. 1235 (LBS), 1991 WL 270473 at *5 (S.D.N.Y. December 11, 1991).

The ABA by-laws provided that a suspended player was placed on a "reserve list" and that no ABA team could "contract with" a player on a member team's reserve list.[1] In order to remove a player from the reserve list, the team suspending the player was required to provide written notice to the Commissioner of the ABA.[2] The Commissioner, in turn, was required to send written notice to each ABA member team that the player was no longer on the reserve list of the team that had suspended him. These notice requirements are sometimes referred to as "waivers." The Spirits Defendants claim that Caldwell was never placed on such a reserve list and that the plaintiff has not come forward with any proof that such a reserve list existed. The plaintiff avers that when Caldwell was suspended he automatically was placed on the Spirits' reserve list by operation of the ABA by-laws.

During the four basketball seasons between 1970 and 1974, Caldwell played ably for the Carolina Cougars and was elected to the All–Star team during two of those four years. In addition, Caldwell was elected Vice–President and later President of the ABA Players Association ("ABAPA"), the player's union. Caldwell was also selected as the player representative for the Cougars and as the Cougars' team captain.

After Caldwell's fourth season with the Cougars, defendant Munchak sold the team

---

1. Section 14.12 of the ABA by-laws provided in part:

    A. The reserve list of a Member Club shall consist of:

    *    *    *    *    *    *

    (3) Players suspended or declared ineligible, or expelled from the League for violation of the contract between the player and the club or for other reasons permitted by the Certificate of Incorporation and By–Laws of the League;

    *    *    *    *    *    *

    B. A player on a club's reserve list shall not be eligible to contract with any other club unless and until the player is released or his contract assigned as provided in the Certificate of Incorporation and By-laws of the League.
    ABA By-laws § 14.12, attached as Ex. 10 to Munchak's 3(g) Statement.

2. Section 14.11 of the ABA by-laws provided in part:

    Except as otherwise provided in the By–Laws, a player shall be considered a member of a team until the Commissioner shall have received notice from that team that the other Member Clubs are free to negotiate with such player. The Commissioner shall upon receipt of such notice immediately and simultaneously notify all the other Member Clubs accordingly; until such notice is sent, no team shall negotiate with any player who is either under contract or on the reserve list of another member team.
    ABA By-laws § 14.11, attached as Ex. 10 to Munchak's 3(g) Statement.

to a group of investors headed by Defendants Ozzie Silna and Daniel Silna. *See generally Caldwell v. Munchak,* 548 F.Supp. 755, 755 & n. 1 (N.D.Georgia 1982) (describing details of sale of Cougars). The new owners assumed all unexpired obligations to Caldwell under his employment contract except that their obligation to provide pension benefits was limited to $10,000. Also in connection with the sale, the ABA provided Munchak with a broad "hold harmless" if the Spirits defaulted on their obligations to Caldwell. However, this indemnification, with respect to the pension benefits, was limited to $10,000. The Cougars subsequently moved to St. Louis and were renamed The Spirits of St. Louis.

Munchak became Commissioner of the ABA after he sold his interest in the Cougars. Although Munchak initially told the ABA member clubs that he would agree to serve as Commissioner only for sixty days, his tenure lasted from June 1974 until July 1975. In return for his services as Commissioner, Munchak received an annual salary of one dollar. Caldwell states in his affidavit that at this time he believed that Munchak continued to own the Spirits based upon alleged representations made by Munchak that such was the case. Caldwell Aff. ¶¶ 19–21.

*The Barnes Incident and Caldwell's Suspension*

On November 20, 1974, Marvin Barnes, another star player for the Spirits, failed to appear for an important game between the Spirits and the New York Nets. Just prior to the game, Caldwell had accompanied Barnes and Marshall Boyer, Caldwell and Barnes' agent, in a limousine to LaGuardia Airport. Barnes and Boyer boarded a plane for Dayton, Ohio. Apparently Barnes' dissatisfaction with the contract he had negotiated with the Spirits motivated him to adopt this negotiating tactic. When the Spirits' Coach Jack MacKinnon inquired later that evening where Barnes was, Caldwell denied any knowledge of Barnes' whereabouts. Caldwell claims that he never advised Barnes to "jump" the team, breach his contract, or do anything else detrimental to the team.

Although Barnes returned to the team shortly thereafter, the Spirits suspended Caldwell because they believed that Caldwell had played a role in the Barnes episode. On December 3, 1974, Caldwell received a telegram from the Spirits informing him that "THE SPIRITS OF ST LOUIS HAVE SUSPENDED YOU INDEFINITELY." David Aff., Ex. G. Caldwell was also advised of his suspension in a letter dated December 3, 1974 which stated in pertinent part:

We wish to advise you that you are hereby suspended without pay or other privileges in accordance with Section 11(c) of an agreement between you and Southern Sports Corporation entered into in October 1970. The duration of your suspension has not as yet been determined and unless good cause is shown by you to the contrary, the suspension will remain in effect for the remainder of the current basketball season and/or your contract will be terminated pursuant to Section 11(i) thereof.

The reason for the foregoing act is as follows:

(i) violation of Section 11(b) of your contract; and

(ii) tortious conduct against the Club....

Letter from Harry Weltman to Joe Caldwell, dated December 3, 1974, attached as Ex. G to David Aff. This letter also informed Caldwell that he was free to contact the Spirits or the ABA Commissioner to discuss the matter further.

The parties are in dispute as to precise duration of Caldwell's suspension. The defendants claim that at some point in early 1975, the Spirits terminated Caldwell's services altogether. They rely on the findings of fact in *Caldwell v. Munchak,* 548 F.Supp. 755, 759 (N.D.Georgia 1982), discussed below, to support their position. Defendants argue in the alternative that if Caldwell's contract was not terminated by the Spirits in December 1974, it would have expired by its own terms on October 29, 1975. In contrast, Caldwell claims that he "was never told that his suspension was lifted, or that the Spirits had terminated his contract, or that other teams were free to negotiate with him." Pl.'s 3(g) Statement at 27; Caldwell Aff. ¶ 26. In other words, Caldwell claims that he was

placed on the Spirit's reserve list "forever." Pl.'s Mem. at 32.

In early December 1974, Caldwell appealed his suspension through the ABAPA to the Office of the Commissioner. By letter dated December 6, 1974, Prentiss Q. Yancey, the General Counsel of the ABA Players' Association, urged Munchak to commence an investigation of the Caldwell suspension and to hold a hearing. On December 10, 1974, the Commissioner's Office advised Yancey that the investigation would commence promptly and that a hearing date would be set. A hearing was set for February 12, 1975 and then adjourned to March 1, 1975.

All parties agree that ABA Commissioner Munchak told the Spirits' management that an indefinite suspension would not be permitted. Munchak also informed the parties that he was willing to recuse himself as an arbitrator because he had personally guaranteed Caldwell's basketball contract.

Shortly thereafter, Caldwell decided he no longer wanted to pursue his remedies before the ABA but instead wanted to litigate his suspension in court. Caldwell claims that the factors that influenced his decision not to arbitrate included: the fact that he had played approximately twenty-five percent of the 1974–75 season for the Spirits and had not received any salary; that Munchak's lawsuit regarding the pension obligations was still pending; that his role as president of the ABAPA made him a target for ABA management; and that he had valuable rights that were negotiated in his contract that he was afraid he would lose in an arbitration. Caldwell Aff. ¶ 32.

Accordingly, in February 1975 Caldwell brought an action in federal district court in Georgia (the "Georgia action") against Munchak, as guarantor of his contract, for unpaid 1974–75 salary that Caldwell claimed was due under the contract. The dispositive issue in the Georgia action was whether the Spirits (and thus Munchak as personal guarantor) were excused from their obligation to pay Caldwell's salary because of the role that Caldwell played in the Barnes incident. After a bench trial, Judge Evans rendered a judgement in Caldwell's favor for unpaid salary in the amount of $220,000, plus interest, costs, and expenses. *See Caldwell,* 548 F.Supp. at 764. The judgment in this action was paid in full. The parties disagree as to the res judicata effect of Judge Evans's findings of fact and conclusions of law.

Caldwell also filed the instant antitrust lawsuit in early 1975. Two factors account for the extraordinary lapse of time between the filing of the complaint and the making of the instant motions. First, in the belief that collateral litigation, especially the Georgia action, would resolve or enable the parties to resolve this controversy, this case was placed on the Court's suspense calendar at the request of the parties. Thereafter, Caldwell went into personal bankruptcy and reactivated this suit only after his discharge. *See Caldwell v. American Basketball Ass'n,* 75 Civ. 1235 (LBS), 1991 WL 270473 at *4 (S.D.N.Y. December 11, 1991) (discussing procedural history of instant lawsuit).

*Other Litigation Involving Caldwell*

In addition to the Georgia action and the instant lawsuit, some of the parties to this action were involved in several other disputes, litigated in various fora, at the time Caldwell was suspended. Caldwell claims that these disputes provided defendants with a motive to conspire to keep him from playing professional basketball.

First, a dispute arose between Caldwell and Munchak regarding pension obligations owed to Caldwell under Caldwell's contract. In 1972 Munchak brought suit against Caldwell in North Carolina state court to reform the employment contract. Munchak contended that the pension was supposed to be $60.00 per month for each year Caldwell played professional basketball, not $600.00 per month. Caldwell counterclaimed to enforce the provisions of his contract. The trial in this action was scheduled to begin on the day that Caldwell was suspended, but was adjourned several times. Ultimately a jury returned a verdict in Caldwell's favor.

Second, at the time the Spirits suspended him, Caldwell, then president of the ABA Player's Association, had refused to sign or approve a labor agreement with the ABA because Caldwell believed that the agreement failed to provide the players with ade-

quate pension benefits, adequate medical benefits, or contract protection in the event the NBA and ABA merged. In October of 1973, a member of the ABAPA negotiating team, William Melchionni, signed a handwritten contract with Mike Storen, who served as the Commissioner of the ABA at that time. Caldwell refused to acknowledge that contract, as did the other representatives of the ABAPA, since it was done without the consent of the ABAPA negotiating committee. This matter was pending before the National Labor Relations Board when Caldwell was suspended.

Finally, at the time of his suspension, Caldwell was one of the plaintiffs in *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867 (S.D.N.Y.1975), which was pending in the Southern District of New York before Judge Carter. One of the purposes of this lawsuit was to challenge the merger of the NBA and the ABA as violative of federal antitrust law.

*Caldwell's Professional History After his Suspension*

After he was suspended by the Spirits, Caldwell never again played professional basketball. In fact, no professional basketball team ever gave him a tryout or an opportunity to compete for a spot on a team.

Caldwell states that he was at all times, ready, willing, and able to perform all obligations and duties required of him under his contract with the Spirits and that he was otherwise fit to play professional basketball at the time of his suspension. He concludes that the failure of any other NBA or ABA team to hire him evidences the boycott of his professional services that he alleges in his complaint. Defendants dispute Caldwell's ability to play basketball at a professional level at the time of his suspension on several grounds. First, defendants claim that Caldwell's age at the time of his suspension—he was 33 years old—made him an undesirable recruit. The defendants provide statistics, undisputed by the plaintiff, that demonstrate that less than two percent of NBA players during the five basketball seasons between 1976 and 1981 were 34 years old or older. Spirits' Defs.' Mem. at 22 n. 17. Second, defendants claim that a torn ligament Cald-

well sustained during the 1971 season interfered with his playing ability. Finally, defendants claim an injury sustained by Caldwell in a January 15, 1975 automobile accident adversely affected Caldwell's ability to play basketball at a professional level.

We will discuss below, in much greater detail, the relevant facts concerning the existence of the alleged boycott of plaintiff's services.

*The Demise of the ABA*

The Spirits lost money in both of the two years the team played, an experience not uncommon to member teams of the ABA. On or about July 1976, five ABA teams were invited to join the NBA; four teams accepted the invitation. The Spirits desired to join the NBA, but were not allowed to for reasons that are not clear. The ABA ceased operations after the 1975–76 season.

## DISCUSSION

### I.

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

The plaintiff's § 1 claim is straightforward: he claims that "the defendants combined and conspired to blacklist him and deprive him of the opportunity to continue his career as a professional basketball player." Pl.'s Mem. at 29. Plaintiff contends that this constitutes a "group boycott" or a "concerted refusal to deal" in violation of § 1.

Section 1 provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. To establish a violation of § 1 of the Sherman Act, a plaintiff must prove two elements: (1) a conspiracy; and (2) an unreasonable restraint of trade. A particular restraint may be adjudged unreasonable:

[E]ither because it fits within a class of restraints that has been held to be *'per se'* unreasonable, or because it violates what has come to known as the 'Rule of Reason,' under which the test of legality is whether

the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (citations omitted).

## A. Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact," and the moving party is entitled to "judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). In determining whether to grant a motion for summary judgment, the Court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of establishing the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial—as would Caldwell on his antitrust claims—the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such a claim. *Id.* at 325, 106 S.Ct. at 2554. To defeat the motion, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), but instead must point to evidence sufficient to establish each element of his case. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

In the last decade, the Supreme Court has considered the propriety of summary judgment in cases arising under § 1 several times. In *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court affirmed a judgment for a terminated distributor of agricultural herbicides who had alleged a § 1 conspiracy between the manufacturer and other distributors to fix resale prices, and termination of the distributor in furtherance of the conspiracy. Addressing the question of the standard of proof required to find an antitrust conspiracy in violation of § 1, the Court held:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1473.

The Court later revisited the issue in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), where a group of American corporations that manufactured or sold consumer electronic products alleged that the defendants, 21 Japanese corporations, had engaged in a 20–year predatory pricing conspiracy. The Court held that a reasonable jury could not return a verdict for the plaintiffs because of the speculative nature of the plaintiffs' theory of predatory pricing, *id.* at 588–89, 106 S.Ct. at 1357, and "the absence of any plausible motive to engage in the conduct charged," *id.* at 596, 106 S.Ct. at 1361. Turning to the applicable standards for summary judgment in antitrust cases, the Court noted:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus in [*Monsanto*], we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently. Respondents in this case, in other words, must show that the inference of conspiracy

is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Id.* at 588, 106 S.Ct. at 1356 (citations omitted). The Court was particularly concerned that courts "not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Id.* at 593, 106 S.Ct. at 1359.

Most recently, in *Eastman Kodak Co. v. Image Technical Services, Inc.,* — U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992), the Court reviewed, again, the standards for summary judgment in a § 1 case. The Court held:

> The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

*Id.* at ——, 112 S.Ct. at 2083 (footnote omitted).

With these standards in mind, we turn to the specifics of Caldwell's § 1 claim.

### B. *Contract, Combination, or Conspiracy*

The defendants contend that Caldwell did not offer evidence of any contract, combination, or conspiracy to deprive Caldwell of the opportunity to play professional basketball after the Spirits suspended him in 1974. Spirits Defs.' Reply at 8–9. Defendant Munchak claims that Caldwell has presented no evidence that he was part of the alleged conspiracy.

The terms "contract, combination ..., or conspiracy" are used interchangeably to describe the requisite agreement between two or more persons to restrain trade. To prove that an agreement exists between two or more persons, a plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Section 1 does not proscribe conduct that is wholly unilateral. *Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469. The Court recognizes that it is the rare case in which a plaintiff bringing a § 1 claim can establish the existence of an explicit agreement among the defendants; most conspiracies are proven by inferences drawn from behavior of the alleged conspirators.

#### 1. The ABA By–Laws

Caldwell contends that the operation of the ABA's by-laws "is sufficient by itself," Pl.'s Mem. at 32–33, to satisfy § 1's concerted action requirement because all of the ABA teams "automatically agreed to an indefinite group boycott of Caldwell's services, in accordance with their By-laws" once he was suspended by the Spirits.[3] *Id.* at 11. When the Spirits suspended him, Caldwell argues, he was automatically placed on the Spirits' "reserve list" by operation of § 14.11 and § 14.12 of the ABA by-laws. Consequently all other ABA teams were prohibited from negotiating or contracting with Caldwell unless and until the Spirits effected "waivers"— *i.e.,* unless and until the Spirits gave notice to the Commissioner that Caldwell was removed from the reserve list, and then the Commissioner gave notice of the same to the other ABA teams. No such "waiver" was ever effected. Caldwell further argues that these by-laws prohibited other ABA teams from negotiating with him even if the Spirits terminated his contract in late 1974—a fact which Caldwell contests vigorously—and even *after* his contract with the Spirits expired by its own terms on October 29, 1975, simply because the Spirits never gave the

---

**3.** Although Caldwell's contract exempted him from the ABA by-laws, the Spirits and all other member teams of the ABA were bound by the by-laws.

notice required by § 14.11 of the by-laws. Pl.'s Mem. at 10–11; *see also id.* at 15.

Essentially, Caldwell claims that the manner in which the by-laws were applied in his case, so as to leave him on the Spirits' reserve list permanently, satisfies the concerted action requirement of § 1. Although the enforcement of sports league by-laws or rules can constitute concerted action for the purposes of § 1, *see, e.g., North American Soccer League v. National Football League,* 670 F.2d 1249, 1256–57 (2d Cir.1982) (NFL's rule banning franchise owners from having ownership interest in any other professional sports team in competing league), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982), we do not believe that Caldwell has come forward with evidence sufficient to convince a reasonable jury that the ABA by-laws were enforced in the manner he suggests.

First, the only evidence offered by Caldwell to prove that the Spirits had a "reserve list" or that Caldwell was placed on a "reserve list" is the existence of the by-laws themselves and certain ambiguous deposition testimony.[4] The Court has serious doubts as to whether a reasonable jury could infer, based on this evidence, that Caldwell was ever placed on the Spirits' reserve list.

Second, even if the Court were inclined to presume that by operation of the ABA by-laws Caldwell was placed on the Spirits' reserve list when he was suspended and that he was never "waived" off the list by the Spirits, there is absolutely no evidence in the record that Caldwell was placed on the reserve list "forever" as Caldwell argues. Pl.'s Mem. at 32. In other words, plaintiff has failed to come forward with any evidence supporting his contention that he remained on the Spirits' reserve list *after* his contract expired by its own terms (or *after* he was terminated by the Spirits, if he was terminated). Indeed, the undisputed evidence leads to the contrary conclusion.

The letter notifying Caldwell that he had been suspended specifically stated:

> The duration of your suspension has not as yet been determined and unless good cause is shown by you to the contrary, *the suspension will remain in effect for the remainder of the current basketball season and/or your contract will be terminated* pursuant to Section 11(1) thereof.

Letter from Harry Weltman to Joe Caldwell, dated December 3, 1974, attached as Ex. G to David Aff (emphasis added). The language of the letter contradicts Caldwell's claim that his suspension was to last perpetually; the letter specifically says that the suspension would remain in effect until the end of the 1974–1975 basketball season unless Caldwell was notified otherwise. In any event, Caldwell has presented no evidence, nor presented a credible interpretation of his employment contract or the ABA by-laws, that would permit a reasonable jury to conclude that Caldwell remained on the Spirits' reserve list *after* his contract with the Spirits expired by its own terms on October 29, 1975.[5] Accordingly, the longest period of

---

4. To "confirm" that this is the manner in which the ABA by-laws operated, Caldwell cites the deposition testimony of Prentiss Yancey and Dave DeBusschere. Yancey was the General Counsel of the ABA Player's Association. DeBusschere was general manager of the New York Nets at the time of Caldwell's suspension; he later became Commissioner of the ABA.

In his deposition, Yancey stated that he was "almost certain that [Caldwell's contract] under either the bylaws or a combination of bylaws and the contract extended beyond the termination date." Yancey Dep. at 96. Yancey also stated, not without equivocation, that it was his opinion at the time of the events giving rise to this lawsuit that the ABA by-laws applied to Caldwell even though they were referenced out of his contract. *Id.* at 98.

Caldwell also cites portions of Dave DeBusschere's Deposition. When asked whether he had

any independent recollection of the ABA procedures regarding the waiver of players, DeBusschere answered unequivocally "not really." DeBusschere Dep. at 55. DeBusschere's answers to a long series of questions put to him regarding the ABA by-laws were based on the assumption that the by-laws, as described to him by plaintiff's counsel, were the ones in effect during his time as ABA commissioner. *See id.* at 52. Specifically, DeBusschere testified that he did not recall whether he did or did not ever receive notice when he was general manager of the Nets that Caldwell was a free agent. *Id.* at 71–72.

5. The defendants contend that Caldwell was terminated shortly after he was suspended, and therefore even if he had been placed on the Spirits' reserve list, he would have been removed at that time. The parties dispute whether this issue is res judicata based on the district court's

time during which Caldwell could have been on the Spirits' reserve list, by operation of the ABA by-laws, is from the date of his suspension until October 29, 1975.[6] The Court also notes that Caldwell never requested a waiver from the Spirits. Indeed, he never even made an application to the ABA for a clarification of his status. *See* Transcript of Proceedings, March 11, 1993, at 44.

Finally, and most importantly, Caldwell has presented no evidence that the ABA member teams failed to offer Caldwell a position with their teams because he was on the Spirits' reserve list. To prove concerted action under § 1 by resort to the ABA by-laws, Caldwell would be required to prove that the other ABA teams failed to offer Caldwell a position on account of those by-laws. There is no evidence that, subsequent to his suspension, any ABA team believed itself impeded from employing Caldwell by the ABA by-laws.

To summarize, this Court concludes, after resolving all doubts in Caldwell's favor, that there is no evidence that Caldwell was on the Spirits' reserve list beyond October 29, 1975, the date on which his contract expired by its

own terms. Caldwell claims only that "the enforcement of the By-Law under which Caldwell was placed and remained *forever* on the Spirits' reserve list" constitutes concerted action in violation of § 1. Pl.'s Mem. at 32–33 (emphasis supplied). Since we believe that no reasonable jury could conclude that Caldwell was placed "forever" on the Spirits' reserve list, and since Caldwell does not claim that the placement of him on the reserve list for the period of time remaining under his contract would constitute concerted action in violation § 1,[7] we conclude that the ABA by-laws are not sufficient by themselves to satisfy § 1's requirement of concerted action.

### 2. Caldwell's Other Evidence of an Antitrust Conspiracy

The Court must determine whether the other evidence proffered by Caldwell is sufficient to raise genuine issues of material fact as to whether the defendants participated in a concerted refusal to deal with Caldwell. Caldwell's claims are as follows:

---

finding in the Georgia action. We need not address this issue since we take the facts in the light most favorable to the plaintiff and assume that Caldwell was never terminated.

6. Caldwell's charge that an antitrust conspiracy prevented him from playing major league professional basketball in 1975 and thereafter is further belied by the terms of the settlement of *American Basketball Ass'n Players Ass'n v. National Basketball Ass'n*, 72 F.R.D. 594, 596 (S.D.N.Y.1976). The settlement provided that all former ABA players not employed on the expansion teams— *i.e.*, the ABA teams that joined the NBA—and not selected in the NBA draft of players from the two excluded ABA teams were free agents and could seek to compete for placement on team rosters in the NBA as of July 26, 1976. *Id.* Accordingly, Caldwell could not have been on the Spirits' reserve list after the execution of the *Robertson* settlement.

7. As noted above, Caldwell argues that "the enforcement of the ABA By-Law under which Caldwell was placed and *remained forever* on the Spirits' reserve list is sufficient by itself to satisfy Section 1's requirement of concerted action." Pl.'s Mem. at 32–33 (emphasis supplied). Nowhere in these protracted proceedings has Caldwell attempted to limit his boycott claim to a specific period of time shorter than "forever." Specifically, Caldwell does not claim that place-

ment of him on the Spirits' reserve list for the period remaining under his contract violates the Sherman Act. Defendants pointed this out to the Court in its moving papers, *see* Spirits Defs.' Reply at 19–20, and again at oral argument, *see* Transcript of Proceedings, March 11, 1993, at 16. Caldwell never informed the Court that he was in fact making such a claim.

If Caldwell were making such a claim, he would face the formidable task of demonstrating to the satisfaction of a jury that the operation of these by-laws violated § 1 under a Rule of Reason analysis. *See Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) ("*per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor"); *North American Soccer League*, 670 F.2d at 1259 ("Because agreements between members of a joint venture can under some circumstances have legitimate purposes as well as anticompetitive effects, they are subject to scrutiny under a rule of reason."); *see also Molinas v. National Basketball Ass'n*, 190 F.Supp. 241 (S.D.N.Y.1961). We also note that if Caldwell were claiming that his placement on the Spirits' reserve list until the expiration of his contract violated the Sherman Act, any recovery would be

1. Caldwell contends that the failure of any member teams of the ABA or the NBA to offer him a contract, or even a tryout, gives rise to the inference that a boycott was in effect.

2. Caldwell claims that he was suspended for no legitimate reason, and that the Spirits Defendants knew this because defendant Munchak had told the Spirits Defendants that he believed that an "indefinite" suspension was not permitted under the ABA by-laws.

3. Caldwell argues that the evidence supports the inference that the defendants had an "economic incentive to conspire to make sure that Caldwell" would never play professional basketball again. Pl.'s Mem. at 7. Specifically, Caldwell claims that the Spirits could not afford to pay his $120,000 salary for the 1974–1975 season in part because they had also contracted to pay Barnes a large salary, and that the Spirits suspended Caldwell to relieve themselves of the salary obligation.

Caldwell also contends that the defendants had a further motive for removing Caldwell. As noted above, Caldwell was both president of the ABAPA and the Spirits' player representative. During the relevant period, the ABA was attempting to merge with the NBA. To ensure competitive bidding with the NBA for players' services, Caldwell opposed a merger between the NBA and the ABA, and had taken some steps to prevent the fruition of such a merger. Caldwell was a plaintiff in a pending antitrust action which sought, inter alia, to block any such merger. *See Robertson v. National Basketball Ass'n,* 389 F.Supp. 867, 873 (S.D.N.Y.1975). In addition Caldwell, in his role as president of the ABAPA, had refused to sign a collective bargaining agreement with the ABA because he believed the agreement did not adequately provide for pension or health care benefits for the players. Based on these facts, Caldwell concludes:

Removing Caldwell thus would eliminate an aggressive union leader who was a major obstacle to a merger the ABA needed and to a collective bargaining agreement the ABA owners, but not the players, wanted; and it would send a chilling message to the other ABA players, and especially union leaders, that aggressive union action, or even counseling a teammate, might jeopardize their careers.

Pl.'s Mem. at 8.

4. In September of 1975, nine months after his suspension, the ABA teams negotiated a new agreement with their players which outlawed indefinite suspensions of players. Caldwell claims that the ABA Players Association wanted the agreement to be retroactive, and therefore to apply specifically to Caldwell, and that the ABA teams insisted that the agreement operate prospectively only. Yancey Aff. at 3–9. Caldwell contends that the ABA teams' ultimate decision that the new agreement would have prospective effect only is evidence of the ABA teams' continued group boycott of Caldwell.

5. Caldwell claims that the defendants acted, on at least one occasion, to prevent an *NBA* team from hiring Caldwell. Caldwell claims that sometime in 1975, after Caldwell's contract expired by its terms, Jerry Colangelo, then general manager of the NBA's Phoenix Suns, expressed an interest in Caldwell. Caldwell claims that Dave DeBusschere [8] called to ask Colangelo whether the Suns were "talking" with Caldwell. Colangelo allegedly told reporter Robert Eger that he "asked [DeBusschere] what concern that was of his." Since the Suns thereafter discontinued their pursuit of Caldwell, Caldwell concludes that DeBusschere "at least implicitly warned [Colangelo] against signing Caldwell." Pl.'s Mem. at 22. Caldwell further concludes that the fact that Caldwell remained on the Spirits' reserve list "chilled NBA teams from pursuing him and it led [DeBusschere] to warn at least one NBA

---

off-set by the amount he collected in the Georgia action.

**8.** Caldwell claims that at this time DeBusschere was Commissioner of the ABA. However the newspaper article which Caldwell relies on describes DeBusschere as the general manager of

the New York Nets. *See also* Pls' Mem at 12 (DeBusschere was General Manager of the Nets during the period from Caldwell's suspension until the summer of 1975). Apparently, this discrepancy was the result of an error on Eger's part. *See* Eger Aff: ¶ 6 (DeBusschere incorrectly identified in article as general manager of Nets).

team not to sign him, or, presumably, face additional charges in the pending antitrust suit." Pl.'s Mem. at 23. DeBusschere is not named as a defendant in this case.

As proof that this "implicit threat" was made, Caldwell cites Eger's December 8, 1975 newspaper article which contains the statements attributed to DeBusschere and Colangelo, within quotation marks. In an accompanying affidavit, Eger states that he would not have placed quotation marks around these statements unless he had accurately reported the precise words spoken by Colangelo and DeBusschere. Eger Aff. ¶¶ 9–11. Defendants have moved to strike the affidavit of Robert Eger and the article in their entirety as inadmissible hearsay.

6. Caldwell claims that a letter from Schupak to the ABA, dated February 4, 1975, indicated that Schupak would object to Caldwell's playing for another team unless he received "some assurance" that the terms of Caldwell's new employment represented a bona fide agreement. In that letter, Schupak wrote:

> I personally advised Prentiss Yancey and Caldwell's then attorney, Bynum Hunter, that the Spirits would release Caldwell from any contractual obligation he had to them, and gave him virtual carte blanche to seek other employment. I also agreed, on behalf of the Spirits, not to object to employment with another basketball club as long as I received some assurance that the terms of employment represent a bona fide agreement. The Spirits had and have no intention of conducting a vendetta against Caldwell, and while he has not met the standards for employment by the Spirits, the Club has no interest whatsoever in seeing Caldwell remain unemployed.

Letter from Donald Schupak to Michael Goldberg, counsel for the ABA, dated February 4, 1975, attached as Ex. I to David Aff. Caldwell contends that this letter created a Catch-22: the Spirits would release Caldwell only if he received a bona fide offer from another team, but the by-laws prohibited all other teams from offering him a position. Pl.'s Mem. at 14 n. 14.

7. Finally, Caldwell repeats several times in his opposition papers that defendant Schu-

pak said to Prentiss Yancey that Caldwell "would never play basketball again." Yancey also testified that Schupak said he would not terminate Caldwell's contract or cap the suspension. Yancey Dep. Tr. at 52–53.

Resolving all relevant factual disputes in Caldwell's favor, this Court concludes that the defendants have demonstrated an absence of evidence supporting elements of Caldwell's § 1 claim and, accordingly, summary judgment is appropriate. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Eighteen years after the complaint in this action was filed, and after extensive discovery has been conducted, plaintiff has failed to come forward with sufficient evidence of the existence of a contract, combination, or conspiracy to allow a reasonable jury to find in his favor. We will briefly explain our reasons for reaching this conclusion.

First, the mere fact that Caldwell never again was offered a position to play professional basketball does not, in and of itself, give rise to the inference that the defendants conspired to blacklist Caldwell from professional basketball. This is especially true since the defendants have proffered a great deal of evidence, much of it uncontroverted by the plaintiff, that Caldwell's age and physical condition made him a less than appealing prospect to other ball clubs.

Second, the fact that ABA Commissioner Munchak, was of the opinion that an "indefinite" suspension of Caldwell was not permitted under the ABA by-laws, and that Caldwell's suspension may not have been justified, does not give rise to the inference that the defendants acted in concert to blacklist Caldwell. At most it indicates that some of the defendants may have breached Caldwell's contract. This, of course, cannot give rise to an antitrust violation. *Cf. Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003, 1004 (2d Cir.1970) (Friendly, J.) (combining assertion of antitrust violation with a claim of injury from breach of contract or tort "does not automatically make the latter a claim arising under the antitrust laws"), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971); *Molinas v. National Basketball Ass'n*, 190 F.Supp. 241

(S.D.N.Y.1961) (Kaufman, J.) (NBA reserve clause did not convert basketball player's indefinite disciplinary suspension into a group boycott against him).

Third, the fact that the Spirits Defendants, and the ABA, may have had an "economic motive" to see that Caldwell was suspended, does not give rise to the inference that they entered into a contract, combination or conspiracy to *forever* ban Caldwell from playing professional basketball.[9] It does not even give rise to an inference that the defendants conspired to make sure that Caldwell was suspended, absent other evidence supporting such a claim.

Nor does Schupak's letter of February 4, 1975, support Caldwell's contention that the defendants engaged in a concerted failure to deal. Caldwell claims that Schupak put impossible conditions on Caldwell's obtaining other employment: specifically that Caldwell get a bona fide offer from another team before the Spirits would agree not to object to Caldwell's employment with another club. Caldwell claims that this was a Catch 22 because no other club could offer Caldwell a position because ABA by-laws prohibited all other teams from negotiating with him. However, Schupak has stated in an affidavit that the concern he was addressing in this letter was that another team would obtain Caldwell's services for some nominal salary, with the Spirits remaining potentially liable for Caldwell's $220,000 per year contractual salary while Caldwell played for another team. Schupak's Reply Aff. ¶ 3. This is consistent with a common sense reading of the letter. Further, since the Court concluded, *supra*, that no reasonable jury could find that the by-laws operated in the manner contended by Caldwell, it follows that no reasonable jury could conclude that this letter created a Catch 22 or that it gives rise to an inference of a group boycott.

9. Furthermore, Caldwell's postulated motives can only be described as speculative. For example, Caldwell's claim that the Spirits could not afford to pay Caldwell's salary is not supported by any evidence in the record. Moreover, even if the Spirits were motivated to suspend Caldwell to avoid paying his salary, it does not follow that the Spirits were motivated to enter into an illegal agreement to boycott Caldwell from playing bas-

■ The only overt act alleged on the part of any of the defendants in furtherance of the alleged boycott is the alleged "implicit threat" made by DeBusschere to Colangelo. As we have already noted, the Spirits Defendants have moved to strike the affidavit. We will consider defendants' motion to strike first.

■ To defeat a motion for summary judgment, it is not required that the non-moving party "produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. However, the non-moving party must proffer evidence that is admissible in substance. Affidavits supporting and opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Thus it is well established that the non-moving party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment." *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir.1985); *see also Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 45 n. 9 (2d Cir.1980) ("A hearsay affidavit is a nullity on a motion for summary judgment."); *United States Football League v. National Football League*, 634 F.Supp. 1155, 1177 (S.D.N.Y.1986). We note that the Eger affidavit and Eger's article constitute hearsay that does not fall within one of the traditional exceptions rendering it admissible. Plaintiff argues that Eger's article is admissible under the catch-all exception to the hearsay rules because it has "circumstantial guarantees of trustworthiness." Fed.R.Evid. 803(24).[10]

ketball for other teams for the remainder of his career.

10. Rule 803(24) provides:

**Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a

This Court disagrees. Eger's reliance not on his memory but on the fact that he employed quotation marks does not furnish circumstantial guarantees of trustworthiness. Accordingly, defendants' motion to strike is granted.

In any event, even were the "evidence" admissible, it is doubtful that a reasonable trier of fact would have concluded that Caldwell's description of the events as an "implicit threat" was accurate. The article reports that DeBusschere called Colangelo to inquire "about whether the Suns were talking with Caldwell," to which Colangelo reportedly responded, "I asked him what concern that was of his." We believe that it is doubtful that a reasonable jury could conclude that either DeBusschere's alleged question, or Colangelo's alleged answer, suggests intimidation. Further, the article reports that Colangelo's statement that "ABA pressure had nothing to do with the Suns' decision not to give Caldwell a shot," but rather that the Sun's decision was based on observation of Caldwell in the 1975 summer league. Finally, DeBusschere is not a defendant in this action, nor does Caldwell present evidence that DeBusschere made this "implicit threat," if that it be, at the behest of the ABA or in furtherance of a conspiracy between the ABA and the other defendants.

The Court also does not believe that a reasonable jury could find concerted action on the part of the moving defendants based on the fact that the ABA did not give retroactive effect to the agreement with the players outlawing indefinite suspensions. The reason for this is simple: plaintiff does not allege that the moving defendants participated in the decision to apply the new agreement prospectively only.

Finally, Caldwell speculates a great deal about what might have motivated the defendants to engage in a conspiracy or "boycott" against Caldwell. Even assuming that these motives as postulated by Caldwell are accurate—and the Court seriously doubts Caldwell could prove them to the satisfaction of a jury—we do not believe that the various motives each individual defendant may or may not have had to be rid of Caldwell gives rise to an inference that the defendants *conspired* to boycott Caldwell in violation of the antitrust laws. As the Supreme Court has noted, there must be direct or circumstantial evidence that reasonably tends to prove "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1473. At a minimum, the circumstances must "warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co.*, 328 U.S. at 810, 66 S.Ct. at 1139. The evidence presented by Caldwell does not support that such a common design existed in this case. For similar reasons, defendant Schupak's alleged threat that Caldwell "would never play basketball again" cannot, standing alone, give rise to a justifiable inference that Schupak and the other defendants conspired to blacklist Caldwell. Caldwell presents no evidence that Schupak took any action to back up this threat in concert with others.

At trial, Caldwell would ask the jury to construct a conspiracy from the fact that he never obtained employment after the Spirits suspended him—although there are other explanations for the lack of interest demonstrated by other teams—and that the defendants had economic motives to be rid of him—although these so-called "motives" are speculative. As we have noted above, "to survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475

material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rule and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 803(24).

U.S. at 588, 106 S.Ct. at 1356. Even assuming that the Spirits' suspension of Caldwell was improper; that the Spirits had an economic motive to remove Caldwell from the team; that the ABA would have been advantaged by Caldwell's exit from professional basketball, no inference of *concerted* action is proper based on the evidence submitted by the parties. The defendants' motions for summary judgment on the first claim is granted.

Having considered each of Caldwell's claims individually, we state, in the interests of clarity, that his evidence, when considered in the aggregate fares no better in raising a genuine issue of material fact upon which a reasonable jury could infer the existence of concerted action by the defendants in violation of § 1.

### 3. Munchak's Alleged Participation in the Conspiracy [11]

■ While Caldwell concedes that there is no "direct evidence" that Munchak endorsed the Caldwell suspension, *see* Pl.'s Mem. at 17, he contends that Munchak nonetheless was part of the boycott. In support, Caldwell claims that Munchak (1) did not warn Caldwell of the boycott and thereby deprived Caldwell of the opportunity to seek preemptive injunctive relief and (2) ultimately did nothing to stop the boycott.

Caldwell further claims that Munchak had an economic incentive to terminate Caldwell's career: Munchak was personally liable for all but $10,000 of the pension obligation to Caldwell. Since this obligation increased with each additional year that Caldwell played professional basketball, shortening Caldwell's career, this argument goes, would reduce Munchak's contractual obligation for pension benefits. As further support that Munchak wanted to limit his contractual obligation to Caldwell, Caldwell notes that Munchak had sued Caldwell to reduce his pension obligation from $600 to $60 per month for each year he played professional basketball. Caldwell also emphasizes that he was notified of his suspension on the day his trial against Munchak regarding Munchak's pension obligations was scheduled to begin and that this "resulted in a lengthy adjournment of that case," which purportedly inured to Munchak's benefit. *Id.*

Even assuming the existence of a conspiratorial boycott of Caldwell by the other defendants (or by other persons), this Court concludes that Caldwell did not offer any evidence that could support the inference that Munchak participated in or approved a conspiracy to boycott Caldwell from professional basketball. While admitting that no "direct evidence" exists which demonstrates Munchak's participation in the boycott, Caldwell claims that Munchak should have acted affirmatively to prevent the boycott. Specifically, Caldwell argues that Munchak was empowered under ABA By-laws to unilaterally reinstate Caldwell with back pay, an assertion disputed by Munchak. Munchak's Mem. at 17. Caldwell claims that Munchak should have used this unilateral power despite the fact that Caldwell decided to bring suit in federal court rather than pursue remedies available to him through the Office of the Commissioner.

Even assuming that Munchak had the unilateral power to reinstate Caldwell with back pay—and there is much undisputed evidence in the record that indicates that Munchak acted entirely appropriately and in accordance with relevant by-laws—Caldwell does not point to a single shred of evidence that shows that Munchak's failure to act was in furtherance of a conspiracy to boycott Caldwell. *See also Caldwell,* 548 F.Supp. at 761 (ABA by-laws "merely gives the Commissioner the power to resolve all disputes that are submitted to him"). There is no evidence in the record to suggest that Munchak's alleged failure to act was anything but unilateral.

Moreover, the undisputed evidence indicates that: (1) Munchak did not participate in the decision to suspend Caldwell; (2) as ABA Commissioner, he scheduled a hearing, at the joint request of Caldwell and the

---

**11.** Although we conclude that there is insufficient evidence to allow a reasonable jury to conclude that there was concerted action on the part of any of the defendants to boycott Caldwell, we write separately with regard to defendant Munchak to address the issues raised in Munchak's motion and to emphasize the dearth of evidence supporting Caldwell's § 1 claim.

Players' Association, to resolve the dispute between Caldwell and the Spirits; and (3) he also offered to recuse himself from presiding over his hearing to avoid any conflict of interest. It is not without significance that it was *Caldwell* who decided not to pursue remedies available through the Office of the ABA Commissioner. Having stripped the Office of the Commissioner of jurisdiction over his dispute with the Spirits, Caldwell cannot plausibly assert that Munchak's failure to resolve that dispute unilaterally is a conspiratorial act in violation of § 1 of the Sherman Act.

Finally, Caldwell's postulated economic motive on the part of Munchak, without more, does not support the conclusion that Munchak participated in a group boycott of Caldwell. This motive argument is undercut by the undisputed evidence that Munchak advanced funds to enable Caldwell to participate in an exhibition summer league. Further, this Court does not believe that the so-called economic motive makes any sense: if Munchak really wanted to limit his exposure as guarantor of the pension provisions in Caldwell's contract, why would he wait until the final year of the five year contract to attempt to minimize his potential exposure?

Therefore, even if this Court had found that genuine issues of fact existed as to whether the other defendants had engaged in a concerted refusal to deal with Caldwell, summary judgment would still have been appropriate in favor of Munchak because Caldwell has presented *no* evidence that he participated in such a boycott.

## II.

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with

foreign nations, shall be deemed guilty of a felony ...

15 U.S.C. § 2. Caldwell claims that the defendants violated § 2 of the Sherman Act in three ways: "[t]hey monopolized the market for professional basketball player services; they attempted to monopolize that market; and they conspired to monopolize that market." Pl.'s Mem. at 68. For many of the reasons already stated, this Court concludes that the plaintiff has failed to present evidence sufficient to support elements of his § 2 claims, and, accordingly, the defendants are entitled to summary judgment. We will discuss each of Caldwell's § 2 claims separately.

1. Unlawful Monopolization

■ Unlawful monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co.,* —— U.S. ——, 112 S.Ct. at 2089 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)); *accord Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985).

The Court must first determine the relevant market and then decide whether the defendants had "monopoly power" in that market. *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992). Defining the relevant product and geographic markets in an antitrust case is often a difficult task. *See generally United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). In its opposition papers, the plaintiff has defined the relevant market as "the market for professional player services." [12] Pl.'s Mem. at 68. The defendants have accepted, for the purposes of this motion, that the plaintiff's market definition is correct. The parties

---

**12.** In his complaint, Caldwell defines the relevant market as "producing, staging and performing professional basketball in the United States." Complaint ¶ 12.

assume that this market includes all ABA and NBA teams during the mid 1970s.

"Monopoly Power is the power to control prices or exclude competition." *E.I. du Pont*, 351 U.S. at 391, 76 S.Ct. at 1005. *See also Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984) (market power is the "power to force a purchaser to do something he would not do in a competitive market"); *Apex Oil Co. v. DiMauro*, 713 F.Supp. 587, 600 (S.D.N.Y.1989) (monopoly power defined as "the impairment of competition through an unlawfully acquired market structure which allows the monopolist to exclude competition or to raise prices without being undercut"). The existence of monopoly power "ordinarily is inferred from the seller's possession of a predominant share of the market." *Eastman Kodak Co.*, — U.S. at —, 112 S.Ct. at 2081; *Jefferson Parish*, 466 U.S. at 17, 104 S.Ct. at 1561; *Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704. Judge Learned Hand's rule of thumb in the *ALCOA* case has guided courts for nearly half a century: 90 percent "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (1945). Courts routinely find monopoly power where the defendant possesses a market share greater than 70 percent. *See Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704 (87 percent of the market constituted monopoly power); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 & n. 6 (8th Cir.1968) (surveying cases and noting that percentages greater than 70 percent generally are found to constitute monopoly power), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969).

The Second Circuit has stated that summary judgment is appropriate in § 2 cases where the defendant's market share is "less than 50%, or even somewhat above that figure, *and* the record contains no significant evidence concerning the market structure to show that the defendant's share of that market gives it monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.*, 651 F.2d 122, 129 (2d Cir.) (emphasis in original), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). This is such a case:

Plaintiff contends that the ABA member teams held 36% of the relevant market's capacity for professional basketball player services at the time Caldwell was suspended. This number is arrived at by creating a fraction in which the number of ABA teams (10) is the numerator, and the total number of teams in the NBA and the ABA (28) is the denominator. We believe that plaintiff's approach to define market share can be described, charitably, as simplistic. The Supreme Court has recently reiterated that in determining the existence of market power, the court must "examine[ ] closely the economic reality of the market at issue." *Eastman Kodak Co.*, — U.S. at —, 112 S.Ct. at 2082. Plaintiff's conclusion regarding the ABA's market share does not take into account disparities between the leagues in ticket sales, broadcast revenues, licensing fees, and other income. In addition, the fact that the ABA was never as successful as the NBA at recruiting the best basketball players and that the ABA collapsed approximately two years after Caldwell's suspension emphasizes that measuring the ABA's monopoly power by reference to the number of teams in the league greatly overstates its strength in the relevant market.[13]

Moreover, even assuming that the ABA had a market share of 36%, that would hardly be sufficient to constitute "market power." Plaintiff, however, contends that it is the ABA's market share, combined with additional actions taken by the defendants, which "gave them total market control and which permitted them to ban Caldwell from professional basketball throughout the entire United States." Pl.'s Mem. at 69. These other factors are as follows:

a) the filing of antitrust suits against the NBA accusing the NBA of trying to drive the ABA out of business by raiding ABA players; b) the threat of a lawsuit for contract interference if an NBA team

---

**13.** Obviously, the Spirits' share of the relevant market is significantly less than 36% since the Spirits were merely one member team of the ABA.

signed an ABA player to whom an ABA team claimed exclusive rights; and c) actual intervention by the ABA Commissioner to dissuade an NBA team from giving Caldwell a tryout, even after Caldwell's contract with the Spirits had expired.

Pl.'s Mem. at 69.

We conclude there is no basis in fact or law for concluding that the defendants obtained "total market control," *id.*, "complete monopsony control over the players services market," *id.* at 70, or "control over the market for player services," *id.*, as Caldwell alleges based on the ABA's position in the market coupled with these other factors. These other factors cannot be equated with monopoly power, as that term is defined under § 2. This is an obvious attempt by Caldwell to dress his unsuccessful § 1 claim in the garb of § 2, which must fail.

### 2. Attempted Monopolization

■ To make out a claim for attempted monopolization, the plaintiff must demonstrate: "(1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*,—— U.S. ——, ——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *see also Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 822 F.Supp. 145, 152–53 (S.D.N.Y. 1993). We do not believe that Caldwell has demonstrated a genuine issue of fact as to any of the three elements.

Caldwell's evidence of the first element—intent to monopolize—simply reiterates the evidence from which Caldwell claims that concerted action under § 1 can be inferred. *See* Pl.'s Mem. at 72. Caldwell relies on the same body of evidence to support the second element—predatory or anticompetitive conduct. *Id.* We do not believe that a reasonable jury could conclude that this evidence, discussed at length in Part I of this Opinion, satisfies either element.

Plaintiff contends that the third element of attempted monopolization—a dangerous probability of achieving monopoly power—is satisfied because "defendants were effectively able to control 100% of the market as demonstrated by the fact that Caldwell was not even able to get a tryout with *any* pro team in either league after his suspension." Pl.'s Mem. at 73 (emphasis in original). We have considered and rejected this argument in connection with Caldwell's § 1 claim. We conclude that no reasonable trier of fact could infer, based on the fact that no team ever expressed an interest in hiring Caldwell, that the defendants were dangerously close to monopolizing the professional basketball market.

Plaintiff also claims that he has shown more than a mere probability of achieving monopoly: he claims that "the defendants actually succeeded here because they cut Caldwell off from the entire market." Pl.'s Mem. at 72. Even assuming, arguendo, that the defendants "cut Caldwell off," [14] this does not indicate that there was a dangerous probability that the ABA or the Spirits or any of the other named defendants were close to monopolizing the market of "professional player services." Once again, it appears that Caldwell's confusion originates in his obvious attempt to fit his § 1 group boycott claim within the elements of a claim of attempted monopolization under § 2. Plaintiff's attempted monopolization claim is without merit.

### 3. Conspiracy to Monopolize

Finally, under § 2 of the Sherman Act, the offense of conspiracy to monopolize requires proof of "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo North American Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988); *accord United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010 (1947); *Apex Oil Co. v. DiMauro*, 713 F.Supp. 587, 599–600 (S.D.N.Y.1989). As we have discussed at great length in Part I of this Opinion, Caldwell has failed to offer evidence which would enable a reasonable jury to find concerted action on the part of

---

**14.** Of course, in Part I of this Opinion we concluded that no reasonable jury could conclude that the defendants conspired to boycott Caldwell in violation of § 1 of the Sherman Act.

any of the defendants. Accordingly, Caldwell's final claim under § 2 must be rejected as meritless.

## III.

### CALDWELL'S PENDENT STATE CLAIMS

In his complaint, Caldwell asserts:

At the time the Defendants indefinitely suspended Plaintiff, Defendants acted maliciously with the intent to destroy Plaintiff's ability to further practice and work in his chosen profession.

Complaint, ¶ 35. Caldwell admits that this was not well pleaded, Pl.'s Mem. at 75, and now contends—eighteen years after this lawsuit was instituted—that it sets forth a claim for either intentional tort or *prima facie* tort under New York law. This claim is asserted against the Spirits Defendants only. Pl.'s Mem. at 74.

1. Prima Facie Tort

■ The elements of *prima facie* tort are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act or series of acts that would otherwise be lawful." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332, 451 N.E.2d 459, 467, 464 N.Y.S.2d 712, 720 (1983); *accord Twin Laboratories v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir.1990). This tort is "designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy." *Curiano v. Suozzi*, 63 N.Y.2d 113, 118, 469 N.E.2d 1324, 1327, 480 N.Y.S.2d 466, 469 (1984). Consequently, an action for *prima facie* tort will not lie where the allegations fall within the scope of a traditional tort theory. *Id.*

■ The touchstone of *prima facie* tort is "disinterested malevolence," meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333, 451 N.E.2d 459, 468, 464 N.Y.S.2d 712, 721 (1983); *Twin Laboratories*, 900 F.2d at 571. Motives other than disinterested malevolence—*e.g.*, profit, self-interest, or business advantage—will defeat a *prima facie* tort claim. *Id.* Caldwell has, throughout these proceedings, ascribed motives to the defendants which cannot be described as "disinterested malevolence," but rather are properly characterized as for profit, self-interest, or business advantage. *See also Amodei v. New York State Chiropractic Ass'n*, 160 A.D.2d 279, 553 N.Y.S.2d 713, 716 (1st Dep't 1990) (claim for *prima facie* tort barred where defendants' motivation for suspending plaintiff was the "maintenance of appropriate professional standards or the resolution of grievances"), *aff'd*, 77 N.Y.2d 891, 571 N.E.2d 70, 568 N.Y.S.2d 900 (1991). Although alternative pleading of *prima facie* tort is acceptable, and therefore alternative pleading of motives on the part of the defendants is also acceptable, nowhere in the complaint or in the papers responding to this motion does plaintiff claim, or offer evidence to support a claim, that the Spirits Defendants' sole motivation for acting as they did was disinterested malevolence rather than self-interest, profit, or business advantage. Accordingly, plaintiff's contention that the defendants are liable for *prima facie* tort is without merit.

In addition, it appears that Caldwell's complaint is insufficient to state a cause of action for *prima facie* or intentional tort insofar as it fails to plead special damages. *See, e.g., Curiano v. Suozzi*, 63 N.Y.2d at 117, 469 N.E.2d at 1327, 480 N.Y.S.2d at 469. This would provide alternative grounds for dismissing Caldwell's third claim. The Court denies Caldwell's belated request for leave to amend his complaint to remedy this omission. Caldwell did not seek leave to amend his complaint when he successfully moved to reinstate his claims in 1990, or when the defendants moved to dismiss this cause of action in 1991. More importantly, for eighteen years, the defendants had no notice that Caldwell's third claim was for *prima facie* or intentional tort. Indeed, in their initial moving papers defendants surmised that the plaintiff's pendent claim was for interference with prospective business advantage. Even the plaintiff characterizes this surmise under the circum-

stances as "understandable." Pl.'s Mem. at 75 n. 36.

### 2. Intentional Tort

To prove intentional tort under New York law, Caldwell must demonstrate, in the very least: "(1) the intentional infliction of harm, (2) resulting in special damages, and (3) without excuse or justification." *Chen v. United States,* 854 F.2d 622, 627 (2d Cir.1988); *see also Board of Education v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 406, 343 N.E.2d 278, 287, 380 N.Y.S.2d 635, 644 (1975) ("Whenever there is an intentional infliction of economic damage, without excuse or justification, we will eschew formalism and recognize the existence of a cause of action."). Caldwell argues that the defendants' conduct is actionable as an intentional tort "[i]f the [defendants'] conduct did violate the antitrust laws or was otherwise unlawful." Pl.'s Mem. at 78. *See also Chen,* 854 F.2d at 628 ("intentional tort involves means which are illegal and corrupt") (citation omitted). As we have already concluded in Parts I and II of this Opinion, Caldwell has failed to offer sufficient evidence to convince a reasonable jury that the defendants, individually or collectively, violated the antitrust laws. Nor has Caldwell offered evidence which tends to prove that the defendants used means which would otherwise be illegal or corrupt. Accordingly, summary judgment is granted to the defendants on plaintiff's claim for intentional tort.[15]

### CONCLUSION

For the reasons set forth above, The Spirits of St. Louis, Donald Schupak, Daniel Silna, and Tedd Munchak are entitled to summary judgment on all remaining claims asserted against them by plaintiff, and the complaint should be dismissed as against them. Plaintiff contends that the other defendants—American Basketball Association, Inc., Ozzie Silna, and Harry Weltman—have failed to appear in this action and are therefore in default. *See* Pl.'s Mem. at 1 n. 1. The plaintiff is hereby ordered to inform the

Court in writing, no later than July 16, 1993, of the status of this case with regard to these other defendants.

SO ORDERED.

---

**15.** It would appear that plaintiff's failure to plead special damages would also provide alternative grounds for dismissing Caldwell's intentional tort claim. *See Chen,* 854 F.2d at 627 (noting that special damages is an element of *prima facie* tort and intentional tort).